Good morning, Your Honors. May it please the Court, my name is Quinn Denver, Federal Defender from Sacramento. I represent Mr. Russell. The district court gave two reasons for denying the motion to suppress evidence, and we believe that neither one of them has merit. The first was that Mr. — the theory was that Mr. Russell had consented to the entry of the police officers. And we think that that's just a misreading of what Mr. Russell consented to. He had — on the telephone, he had told the dispatchers that he had shot himself in the foot, he had asked for medical aid. He said, ultimately, that he had crawled down to the front door and that he had opened the door. MR. DUNN Well, Counsel, I think that the transcripts that you supplied of the 911 tapes to the Sacramento sheriffs and fire dispatchers indicated that there was some confusion as to exactly what had transpired at the scene of this incident. Is that right? First, your client gave a false name. He was very vague about how he was shot, who was present. I mean, it looked to me like there was a good deal of confusion on the part of the responding officers as to exactly what kind of trouble they were responding. MR. DUNN There may have been confusion by the particular officers who were coming there and made the entry, Your Honor. But I think you have to look to the collective knowledge of all the officers, including the dispatchers. And when you look at that tape, there is no doubt that there's only one, and the dispatchers knew it, one person called the ambulance. CHIEF JUSTICE ROBERTS But the officers weren't looking at the tape. They were listening to a radio and looking at a mobile data terminal, trying to make sense out of what was happening. And the district court found, as a factual matter, that the officers, at the time they arrived at the scene, had a legitimate concern not only for their safety but for the safety of the paramedics who were going to treat whoever was injured at that location. MR. DUNN But, Your Honor, what you have to look at under both the Supreme Court law and this Court's law is the collective knowledge of everyone involved in this, including the police dispatchers. That's what the ---- CHIEF JUSTICE ROBERTS Our collective knowledge has never gone so far as to say that an officer has to basically take his life into his hands because he doesn't know at the time he hits the front door what the dispatcher knows. I don't think I read our cases as to say that he's not entitled to make a protective sweep of the premises to see whether or not there may be an armed person lurking within. MR. DUNN Well, Your Honor, your cases have said in the community caretaker doctrine that in every case you have required that they do something to determine that there is, in fact, an emergency and there, in fact, is an immediate need for police assistance. CHIEF JUSTICE ROBERTS And is there any ---- you're not contesting the fact that this was a genuine emergency, are you, Mr. Dunn? MR. DUNN It was a medical emergency. It was a medical emergency. CHIEF JUSTICE ROBERTS Emergency by gunshot wound. MR. DUNN That's correct. CHIEF JUSTICE ROBERTS Which may be accidental and may be intentional, but we've got a serious problem here, don't we? It's called an emergency. MR. DUNN He said he shot himself in the foot. He said there was no one else on the scene. If they had made an inquiry of their own dispatcher, they would have realized there was only one man who had called in. CHIEF JUSTICE ROBERTS Until they arrived on the scene and saw that there were females present who had not even been indicated to the dispatchers as even being there. That's what the female sheriff's deputy testified. MR. DUNN Well, there is an indication on the CAD report that there was a woman's voice heard and there was a woman's voice heard by the dispatcher. They could have made an inquiry of the women, what is going on here, and they would have found out that one of the women, who was the owner of the house and the other was Mr. Russell's mother, would have told them there's no one in the house. That was the only reason they could go in there. CHIEF JUSTICE ROBERTS Counsel, I guess the problem I'm having is I understand the job of lawyers and judges in the calm reflection of this courtroom to be second-guessing the decisions of officers responding to an emergency. But the Supreme Court has told us time and again that reasonableness is the linchpin under the Fourth Amendment. And don't we have to look at these facts from the standpoint of a reasonable police officer faced with a rapidly evolving and confusing situation and the district court's factual finding that this entry was justified by the emergency doctrine and by the fact that there might be armed subjects inside and perhaps other injured people? MR. DUNN Well, Your Honor, the district court's finding is a conclusion of law. It's not a factual finding that binds this court. CHIEF JUSTICE ROBERTS Isn't it a mixed question of law and fact? He held an evidentiary hearing and testified. MR. DUNN Which is reviewed de novo. If it's a mixed one. CHIEF JUSTICE ROBERTS Review the findings of fact for clear error and the conclusions of law de novo, right? MR. DUNN Yeah, but he made the finding he may have made was regarding the scope of the consent. And that one I think is clearly erroneous. CHIEF JUSTICE ROBERTS You want to find his own consent. I want to tell you the first ground was the emergency doctrine. MR. DUNN I would like to talk about both those. But what I'd also like to talk about is reasonableness is they get a call about a person who's been shot. One officer waits. They don't even go in there. They finally go up to the point and they make no questioning. CHIEF JUSTICE ROBERTS Are you saying the right of the officer to wait for other officers to arrive before they enter? I mean, it seems to me that's prudent police practice. MR. DUNN I'm questioning how great an emergency there is if she does not even go in to see who these people are coming out of the house. CHIEF JUSTICE ROBERTS Are you familiar with police procedures and a holding quad? Do you know what that is? Where officers basically wait until sufficient help arrives before they enter a dangerous situation where there may be armed people inside. You don't send individual sheriff's deputies in on unknown trouble with a man injured by a gunshot wound alone. MR. DUNN A man who has reported twice that he shot himself in the foot, that there's no one else there, and there's no reason to think that he's saying anything else. CHIEF JUSTICE ROBERTS Except that instead of one person, now there are three when the female officer arrives. MR. DUNN He said that when his girlfriend got back, she was going to be really mad at him. They do hear a woman on the tape, and they could ask the woman, what's going on here? They can make some inquiry when they come there. They immediately go in. They see the man who's clearly the man who shot. He's got a bloody towel on his foot. They see two women there. They see a car there, and they make no inquiry at all. They don't say they don't even say, what's up? What happened? Is someone else in there? Is the gun there? They make no inquiry at all. They had ample opportunity to resolve some of this. CHIEF JUSTICE ALITO You want us to rule, Mr. Denver, as a matter of law, it was unreasonable under the Fourth Amendment for the officers to go in and determine whether or not there might be danger lurking inside. Without making any attempt to determine whether there was or was not, based on what they knew at that time. MR. DENVER What's your best case to say that it was unreasonable for the officers to do that under these laws? CHIEF JUSTICE ALITO Every one of your cases that's upheld the community caretaker doctrine search has they've always made some other attempt, regardless of what it was. And it's supposed to be a very limited thing. There has to be an emergency, and there has to be a need for immediate police assistance. Now, why can't they determine what is the immediacy of it and what is the emergency when there's an obvious, viable way of determining that? Now, if there was no one there and they had no way of doing any further determination, that would be one thing. But they did have a very simple way of finding out, was there an emergency? Was there a need for immediate assistance? And if they had asked that question, they would have found there was no emergency, there was no need for immediate assistance, and there would have been no entry. And that is because they would have to believe everything that Mr. Russell said to them in response to their questioning at the scene when he'd already lied to the dispatchers on the 2911 calls? They didn't talk to him. They didn't talk to the two women. They didn't talk to anybody. They came right up and ran right in. I guess what you're asking us to do is you're asking us to hypothetically conclude that had they conducted questioning of Mr. Russell, he would have for the first time told the truth, and that was that he shot himself and that there was nobody else inside. He had said that he shot himself. He made that very clear that he had shot himself. The first time when he called the sheriff's dispatcher, he wasn't quite that clear, was he? Well, he had shot himself with a .44 in the foot. He ultimately told him in the foot. He didn't give him a detailed he was in pain. He was calling for medical aid. But he was also a convicted felon, and he didn't want to be found with a gun. And they, well, that may have been true. But there were two women there who could have answered the question as to was there an emergency and was there a need for immediate assistance? They made no attempt to talk to those women. And those women would have cleared up the matter. There would have been no entry, and we wouldn't have been here today. Mr. Denver, you're down to a little under two minutes. May I am on a reserve? I will, Your Honor. Thank you. May I do so? We'll hear from the government. Good morning, Your Honor. My name is William Wong. I'm an assistant U.S. attorney from the Eastern District of California. Let me first clear up a factual matter. When the first call came in, it came in to a different dispatcher. And in the first call, the caller identified himself as Gregory Hines. Now, Mr. Hines did not say he shot himself in the foot. What was said there was that a gun went off, and he was shot in the foot. A gun went off, and he was shot in the foot. Not that he shot himself in the foot. Secondly, in particular — In the second call, he says he shot himself in the foot. In the second call to a second dispatcher, a different dispatcher, he identified himself as Willie Russell, and that he shot himself in the foot. That was in the second call. But in the first call, there was a dispute between the fire and the police dispatcher. And in that dispute on tab 3 of page 2, the police dispatcher says to the fire dispatcher he didn't really confirm that he shot himself. He just said a gun went off. So now you have two different individuals being shot. Now, what happened hypothetically? They said they shot themselves or someone was shot in the chest. Does the fact that it was a foot somehow create the conclusion that it had to be only one person, one victim? In this particular case, when the officers arrived, Deputy Summer Elliott went to that person and asked him to identify himself. He refused to do that. He refused to tell the officer what had happened inside. Now, these people, these officers and oncoming paramedics are coming onto the scene. They have to be — they have a right to be safe in their duties. There is a gun that has been unaccounted for. That gun is inside the house. Mr. Russell, in the second call, says he does not know where it is. I think the difficulty that I have, and maybe you can help me with that, is that I don't think we have a single case in which we have an empty house, basically, and this has happened. There's something that's happened inside. For example, Martinez, which is probably the far reach of our case law on this, there was somebody inside yelling. And there was some suspicion that the person might have had a knife in his chest. And even in those circumstances, the officers go and they ask somebody outside, who's in, what's going on, and so forth. Here, we don't have that circumstance. What we have is, and I grant you all of the things that you've said, which are good arguments, but at the scene, once it's secure and Mr. Russell is gone, what we have is an empty house and then no attempt to find out what's going on. It seems to me the natural inference is it became a criminal investigation then and not an attempt to secure the emergency. Do you have a case that's better than Martinez for you on this? No, Your Honor. I think this was a matter of minutes and seconds. If a person is shot, especially with a high-powered pistol, they can bleed out in a matter of seconds. The officer was under these extreme circumstances. They're driving at high speeds to reach this home. They're trying to avoid getting hit or hitting other people on the road. They're not able to watch the cat events show up on the monitor. They're hearing oral transmissions as to what occurred. They hear that there's two victims in there, potentially two victims. They need to reach that second victim. The first person out there never identifies himself. He refused to identify himself. He refused to tell the officer what had happened inside. These officers have a right to determine whether or not there's danger lurking inside. To do that, they have to make the entry. They're looking for ---- I think the key question is, if there is an opportunity to make an inquiry at the scene, and there was, aren't they obligated to do that, do something more than just burst into a house and start looking around? I mean, you've got a situation where it goes through the door and there's obviously there's nobody there. They're calling out, and then they conduct a search. But the opportunity was taken by Deputy Elliott. She asked him who he was. He refused to identify himself. Well, this, I guess getting back to my question then, my initial premise, Martinez is the best case for you. In Martinez, they had somebody angry yelling inside the house. They knew there was trouble, potentially either a weapon or somebody injured. That's the best case you have in our circuit, right? But, you know, to answer the Court's question ---- I'm just asking if you've got a better case. No, I don't. Okay. Well, here you are. So this would be the first case where there's no indication except for the 911 call, and that may be enough for you, but except for that, that there is, we have no indication that there's anything else going on in the house. The indication is there's a potential second victim. At the scene, once they arrive. Once the officer made entry, this is a two-floor home. He cleared it in a minute and 11 seconds looking for a potential second victim. They did not go on a search. This was not a criminal investigation. They made entry to look for a second victim and to make sure there was not a dangerous subject inside working with a gun. They went inside, and within a minute and 11 seconds, they cleared it and called the paramedics, it is now clear for you to come on. So this is not a criminal investigation at the time. Counsel, is there any evidence that Mr. Russell denied or tried to stop the officers from coming to the house or denied consent in any way? No. There's no evidence that he told the officers he could not make entry. He refused to even identify himself. As to the consent issue ---- So we can ---- I don't understand your argument that we can infer consent to entry by someone not identifying himself. Well, because the ---- What's your best case on that? Well, you come to the door and you say, who are you? And you say, I'm not going to tell you. Does that give the officer the right to come into your house? But this is ---- he was not at the door. He was outside. No, no. I mean, I'm asking hypothetically. Our law on consent doesn't go anywhere near that, does it? Well, the fact of this case is peculiar because the person who gave consent says, I am crawling to the door. I will open the door for the officers to come in. That's what he says. That consent is given to the officers. Now, is that on the tape? Where is that coming from? Is that on the tape? That is on the tape. All right. It's on the tape. He says, I'm crawling to the door. I cannot walk. Basically, the inference is that he's at the door, so the officers make entry to look for this person. Right. But we have to rely on inference and circumstances to infer a consent to a criminal search. I think you're in fairly serious Fourth Amendment trouble, aren't you, in terms of the validity of the consent? I disagree with Court because when a person tells the officer he's opened the door for them, that he's crawled to the door, the officer can only infer that the person is still inside the house. Yes. And so once he's outside the house, what gives them the right to make the inference that he's consenting to a search of the house? How do they know it's the same person that's outside? Because they got there within seconds. No. We're talking about consent, not emergency. The two analyses are completely different in this context. You say that he gave consent for the police to search his house. What he said was, I'm at the front door. You can come in and get me. Right? Correct. And you say that we should infer that he consented to a search of his house. Well, he consented to a search to entry to look for a person that needs medical  That's what he consented to. And that's what the officers did. They went into the hall. And they found him right away. And they found him right away. They don't know that. They don't know it's the same person. What I'm saying is, in order to put that weight on consent, because it has to be knowing voluntary consent, you have to be fairly specific about it. And the inferences that you are trying to draw from that are fairly significant, it seems to me. And outside the bounds of the normal, our normal consent law, most of our consent law, there's a good writing. You say, may we go and search your house? Yes, you may. Normal consent issues What's your best case on it? This is a highly time-of-the-essent type of consent. The officers had to respond quickly. And their consent was to make the entry. Once they made the entry, they had the right to protect themselves. But that's the emergency doctrine.  I understand. It meshed with each other. That's the problem with this case. They kind of tied in together. Mr. Wong, I'm not sure I understand your answer to Judge Thomas' question. Are you saying that the officers did not necessarily know that the person outside the house was the person who had consented to the entry and that the entry was not criminal? It was under the emergency doctrine for purposes of looking for a victim who had called the dispatcher to say he'd crawled to the door and had unlocked the door and was waiting inside. That's correct. They didn't know that was the same person. For all they knew, there were two people there that was injured. Is there anything else? I would be more than happy to answer any questions. Thank you, Counsel. Thank you, Your Honor. We'll hear from Mr. Denver. He has some reserved time. Well, let me start with your question, Judge O'Scanlan. Did he at any time say you can't go in? He had no opportunity to. The officers, as soon as they arrived on the scene, although they saw that Officer Elliott was talking to Mr. Russell and to the two women, they went immediately in. There was no time where he would have done that. And it seems the other thing that had been raised was the other thing. Well, do you agree that so far as the officers' knowledge was concerned, they were expecting two people? One was Mr. Hines and the other one would be whoever the other, I guess, was? I don't believe that's correct, Your Honor. I think they did not know exactly what was true there. But if you look at the tape, it's pretty clear. A man calls in 9-11 and says, I've been shot in the foot. I'm talking about the officer's knowledge, not what was on the tape, because the officers didn't necessarily hear the tape. Isn't that right? That's right. They did not. They made no inquiry about this either, whether there were two people, what the situation was. They just – but one of the officers testified at the time they thought that there could have been two people on the tape. That's what I was referring to. Okay. But they made no inquiry of – although he had said on the tape and that there was nobody else in the house, the person who had called in. And it was clear. Somebody called in and said, I've been shot in the foot. I want medical aid. And then is cut off and then calls right back and says, I've been shot in the foot and I need medical aid. The idea that there's two people who got shot in the foot calling at the same time back-to-back doesn't seem very logical. But I think the key point here is that there was plenty of opportunity. If there was any uncertainty, there was plenty of opportunity to clear up the uncertainty. And the officers made zero attempt. They didn't make any attempt at all to do that. And I don't think that your cases have gone that far as to say that they don't have to – when there's an obvious way to learn more information, that they shouldn't exhaust that before they go in. Thank you. Thank you, Mr. Denver. Thank you, Mr. Denver. The case just argued will be submitted for decision.
judges: O'scannlain,thomas, Tallman